**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RICHARD LEE DOBBINS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>Defendant. | Civil Action No. 24-3271 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

This action, brought by thirty plaintiffs, arises out of the June 25, 1996, bombing by Hezbollah of the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel.  *See* Am. Compl. at 2-3 (Introduction), ECF No. 6.  The bombing killed nineteen U.S. Air Force personnel and injured hundreds more, including injuring the four servicemember plaintiffs in this case.  *Id.* ¶¶ 41, 51.  The plaintiffs in this case also include the immediate family members of the four injured servicemember plaintiffs and of other servicemembers who were injured in the bombing and were previously awarded damages in other cases arising out of the Khobar Towers bombing.  *Id.* at 3 (Introduction).  Based on allegations that defendant, the Islamic Republic of Iran ("Iran"), "provide[d] material support and resources to Hezbollah," and thereby enabled Hezbollah to carry out "large-scale terrorist operation[s] designed to kill Americans," *id.* ¶¶ 33, 39; *see also, e.g.*, *id.* ¶ 34 (noting that Iran has been found "to be liable as a foreign state supporting international terrorism . . . to victims of state sponsored terrorism for the acts and actions of defendant Hezbollah in cases before this Court"), plaintiffs seek damages for their injuries suffered as a result of the attack pursuant to the terrorism exception to conferral of immunity on foreign sovereigns, under the Foreign Sovereign Immunities Act

1

("FSIA"), 28 U.S.C. § 1605A.  Plaintiffs complied with the FSIA's requirements for effectuating service on a sovereign defendant, but defendant has failed to enter an appearance or otherwise defend against this action.  *See* 28 U.S.C. § 1608(a)(4); Return of Service/Aff., ECF No. 15; Clerk's Entry of Default as to Iran, ECF No. 17.

Plaintiffs now seek entry of default judgment against defendant as to liability and damages. Pls.' Mot. for Default J. as to Liability & Damages ("Pls.' Mot."), ECF No. 20; Pls.' Mem. in Supp. of Mot. for Default J. ("Pls.' Mem."), ECF No. 21-1.  For the reasons detailed below, plaintiffs' motion is granted in part and denied in part.

## I.      BACKGROUND

Fifteen prior decisions have found Iran to be liable for the Khobar Towers bombing.  *See, e.g.*, *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) (Lamberth, J.); *Est. of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229 (D.D.C. 2006) (Lamberth, J.); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010) (Lamberth, C.J.); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888 (D.D.C. June 27, 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, No. 19-cv-464 (BAH), 2020 WL 619925 (D.D.C. Feb. 7, 2020) (Howell, C.J.); *Christie v. Islamic Republic of Iran*, No. 19-cv-1289 (BAH), 2020 WL 3606273 (D.D.C. July 2, 2020) (Howell, C.J.); *Blank v. Islamic Republic of Iran*, No. 19-cv-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021) (Howell, C.J.); *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 WL 3354720 (D.D.C. Aug. 12, 2022) (Howell, C.J.); *Mustard v. Islamic Republic of Iran*, No. 21-cv-163 (BAH), 2023 WL 1778193 (D.D.C. Feb. 6, 2023) (Howell, C.J.); *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) (Howell, J.); *Thole v. Islamic Republic of Iran*, No. 23-cv-793 (BAH),

2024 WL 2208208 (D.D.C. May 16, 2024) (Howell, J.); *Est. of Johnson v. Islamic Republic of Iran*, No. 23-cv-1689 (BAH), 2024 WL 3225954 (D.D.C. June 28, 2024) (Howell, J.); *Breezee v. Islamic Republic of Iran*, No. 23-cv-3392 (BAH), 2025 WL 2719250 (D.D.C. Sept. 24, 2025) (Howell, J.); *St. John v. Islamic Republic of Iran*, No. 23-cv-2333 (BAH), 2026 WL 1532818 (D.D.C. April 6, 2026) (Howell, J.).

In *Blais* and *Heiser I*, the Court heard evidence and witness testimony about the connection between Iran and the attack on the Khobar Towers.  *See Blais*, 459 F. Supp. 2d at 46 n.4, 48-49; *Heiser I*, 466 F. Supp. 2d at 250.  In *Heiser I* alone, the plaintiffs' examination of witnesses, including seven expert witnesses, and presentation of other evidence took seventeen days.  *See* 466 F. Supp. 2d at 250.[1]  Other cases, including *Rimkus*, *Akins*, and *Schooley*, have concluded that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus*, 750 F. Supp. 2d at 173; *Akins*, 332 F. Supp. 3d at 10-11; *Schooley*, 2019 WL 2717888, at *2, and plaintiffs here argue that "the Islamic Republic of Iran is collaterally estopped in this action from denying that it is liable for the acts and actions of Hezbollah in carrying out the terrorist attack at issue here," Am. Compl. ¶ 34.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID.

---

[1]    The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former director of the Federal Bureau of Investigation ("FBI"); (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism; (3) Dr. Bruce Tefft, a founding member of the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism; (4) Dale Watson, the former deputy counterterrorism chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260-65, 263 n.18; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on the grief process, *see id.* at 269-70; and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273-74.

201(b).[2]  In this District, Rule 201 has been applied frequently to take judicial notice of factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)).  Using judicial notice in this way avoids "the formality of having that evidence reproduced" in each new case. *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011) (quoting *Rimkus*, 750 F. Supp. 2d at 172)); *see also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation" (internal quotation marks and citation omitted)); *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (Lamberth, C.J.) (taking "judicial notice of the evidence presented in the earlier cases").

Importantly, taking judicial notice of prior findings "does not conclusively establish the facts found" as to the instant case.  *Foley*, 249 F. Supp. 3d at 191.  Instead, "based on judicial notice of the evidence presented in the earlier cases[,] . . . courts may reach their own independent findings of fact." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) (Lamberth, C.J.); *see also Rimkus*, 750 F. Supp. 2d at 172 ("[C]ourts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them.").

---

[2]     "[A]djudicative facts are simply the facts of the particular case." *Nat'l Org. for Women v. Soc. Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, J., concurring) (quoting FED. R. EVID. 201, Advisory Committee Note).  The Rule does not govern judicial notice of "legislative fact[s]," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049, 1051 (D.C. Cir. 2014) (finding that plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice).

Persuaded that this approach is both "efficient and sufficiently protective of the absent defendants' interests," *Akins*, 332 F. Supp. 3d at 11, plaintiffs' request for judicial notice to be taken of the evidence presented in other cases, including *Akins*, *Schooley*, *Blais*, *Heiser I*, *Rimkus*, *Christie*, and *Gration*, is granted. Pls.' Mem. 5-6 (listing "numerous prior decisions" where "[t]his Court has already found defendant liable for the same terrorist attack"); *see Akins*, 332 F. Supp. 3d at 11 (stating that "factual evidence developed in other cases involving the same conduct by the same defendants is admissible and may be relied upon in this case"); Pls.' Mem. at 8 (requesting judicial notice be taken of the "prior findings of fact and supporting evidence imposing liability under Section 1605A" in "ample uncontradicted precedent"). The evidence regarding the Khobar Towers bombing is summarized below, followed by an overview of the procedural history of this case.

## A. The Attack on Khobar Towers

"The Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed the coalition forces charged with monitoring compliance with [United Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47. Shortly before 10:00 pm on June 25, 1996, "a large gasoline tanker truck" drove up to the Khobar Towers complex and parked "alongside the perimeter wall." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Am. Compl. ¶ 41 (describing that the

"two men [who] drove a stolen Mercedes Benz tanker truck containing the bomb . . . parked the truck 80-100 feet from a building which housed American personnel"). After parking, the driver of the truck "jumped out, ran into a waiting car that had pulled up near the truck, and sped off." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Am. Compl. ¶ 41 (stating that "[t]he men drove away in a waiting Chevrolet Caprice, which had also been stolen as a getaway vehicle"). Although security guards stationed near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle location," the truck exploded "within about 15 minutes." *Heiser I*, 466 F. Supp. 2d at 252. The blast "sheared off the face of Building 131," *id.*, and "caused structural damage in buildings a quarter mile away," Am. Compl. ¶ 41. Investigations of the attack "determined that the force of the explosion was the equivalent of 20,000 pounds of TNT," which the U.S. Department of Defense described as "the largest non-nuclear explosion ever up to that time." *Heiser I*, 466 F. Supp. 2d at 252.

### B. Defendant's Role in the Attack

The U.S. Department of State has designated Iran as a state sponsor of terrorism since January 19, 1984. *Blais*, 459 F. Supp. 2d at 47; *see also, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 59 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism [https://perma.cc/VF4X-JQU4] (last visited July 2, 2026).

Prior proceedings have found that Iran planned and supported the Khobar Towers bombing. Both Ayatollah Ali Khamenei, the supreme leader of Iran at the time of the attack, and Iran's Minister of Intelligence and Security "approved" the attack. *Heiser I*, 466 F. Supp. 2d at 252. The truck bomb used in the attack was "assembled" at a base in Lebanon's Bekaa Valley, which base was "jointly operated by the IRGC [(Islamic Revolutionary Guard Corps)] and by the terrorist

organization known as Hezbollah." *Id.* The individuals who carried out the bombing drove the bomb from this base to Dhahran and called themselves "Saudi Hezbollah." *Id.*

These factual findings are based in part on testimony provided by four key expert witnesses in *Blais* and *Heiser I*, including Louis Freeh, who served as the director of the FBI at the time of the bombing, and Dale Watson, who served as the deputy counterterrorism chief of the FBI at the same time. The testimony of both Freeh and Watson in *Heiser I* was based on their oversight of the FBI's "massive and thorough investigation of the attack," which investigation involved "over 250 agents." *Id.*; *see also id.* at 260-62 (describing the testimony of Freeh and Watson and the basis for each expert's knowledge of the incident).[3] Based on information gathered in their investigations, both Freeh and Watson testified to their conclusions that "Iran, MOIS [(Iran's Ministry of Intelligence)], and IRGC were responsible for the Khobar Towers bombing carried out by Saudi Hezbollah." *Id.* at 264; *see also Blais*, 459 F. Supp. 2d at 48.

Additional expert testimony was provided in *Heiser I* by Dr. Patrick Clawson, who based his opinions on "his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials," and "his academic research on the subject." 466 F. Supp. 2d at 262. According to Clawson, "the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and . . . Saudi Hezbollah carried out the attack under their direction." *Id.* at 253. This opinion was also supported by Dr. Bruce Tefft, a former founding member of the CIA's counterterrorism bureau, who testified, based on "publicly available sources that were not inconsistent with classified information known to him from his

---

[3]     During this investigation, the FBI interviewed six members of Saudi Hezbollah, each of whom admitted "their complicity in the attack on Khobar Towers, and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers." *Heiser I*, 466 F. Supp. 2d at 253. This investigation ultimately resulted in an indictment, returned by a grand jury in Alexandria, Virginia, "against 13 identified members of the pro-Iran Saudi Hezbollah organization." *Id.* at 252.

time at the CIA and from his security clearances since that time," that there was "no question" that Iran was "responsible for planning and supporting the attack on the Khobar Towers" and specifically that the attack "wouldn't have happened without Iranian support." *Id.* at 254.

### C. The Instant Plaintiffs

The thirty plaintiffs in this lawsuit include four servicemembers, who suffered "physical and psychological injuries," and nine of their immediate family members, as well as seventeen immediate family members of other servicemembers awarded damages in four previous actions arising out of the attack on the Khobar Towers. Am. Compl. ¶¶ 16-32, 51 (explaining that two family member plaintiffs are immediate family members of injured servicemembers who were plaintiffs in *Aceto*, 2020 WL 619925; thirteen are the immediate family members of injured servicemembers who were plaintiffs in *Akins*, 332 F. Supp. 3d 1; one is the immediate family member of an injured servicemember who was a plaintiff in *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010); and one is the immediate family member of an injured servicemember who was a plaintiff in *Thole*, 2024 WL 2208208). Each of the four servicemember plaintiffs and associated family members are described below, followed by the plaintiffs who are family members of servicemembers awarded damages in *Aceto*, *Akins*, *Valencia*, and *Thole*.

### 1. Servicemember Brandan Johns and Three Family Members

On June 25, 1996, Brandan Johns was an Environmental and Electrical Specialist in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Brandan Johns ("Johns Decl.") ¶¶ 2, 4-5, ECF No. 21-1 at 2. When the bomb denotated, Johns was lying in his dorm room, and "the window blew out on top of [him]." *Id.* ¶ 6. As a result of the blast, "[his] whole body felt like it was on fire" as "[t]here was broken glass all over [him], the bed, and on the floor of the room." *Id.* He suffered from "bleeding in several parts of [his] body

where it had been cut by broken glass." *Id.* ¶ 7. Following the bombing, Johns "helped [another servicemember] staunch his blood flow by putting pressure on his wound, and guided him toward the makeshift infirmary and triage center." *Id.* ¶ 10.

After the bombing, Johns "felt concussion symptoms for weeks" and "disoriented and on edge for a long time." *Id.* ¶ 14. His roommate Brent Marthaler was killed in the bombing. *Id.* ¶¶ 3, 13. At Marthaler's funeral, Johns "was overwhelmed by grief again" and has since "suffered from severe PTSD symptoms," "sleep problems, anxiety and depression." *Id.* ¶¶ 15-16. He received a combined 70% disability rating from the VA, all attributable to PTSD. *Id.* ¶ 17; *id.*, Ex. B, Brandan Johns VA Disability Benefits Letter ("Johns VA Disability Rating"), ECF No. 21-2 at 11.

Three of Johns' family members—his mother, Rosemary Johns through her estate, father John Johns, and his sister Mary Beth Husing—are also plaintiffs in this lawsuit. Rosemary Johns passed away in 2025, and her husband, John Johns, was named in Rosemary's will as the personal representative of her estate. Decl. of the Estate of Rosemary Johns via John Johns ("J. Johns Second Decl.") ¶ 3, ECF No. 21-2 at 15. When Rosemary Johns heard about the attack on television, she was "very upset" and "crying." *Id.* ¶ 8. As she waited for news of Brandan, Rosemary "was clearly very distressed." *Id.* She "was happy to see Brandan again, but also saddened . . . by the changes in him." *Id.* ¶ 12.

When John Johns heard from Rosemary about the attack, he and Rosemary "worried that Brandan might be among the victims," and he "felt helpless and angry at whoever did this." Decl. of John Johns ("J. Johns First Decl.") ¶ 6, ECF No. 21-2 at 13. When Brandan returned home, John felt that Brandan "kept things bottled up inside" and "knew he was deeply affected by losing his close friend." *Id.* ¶ 8. John thought that Brandan was "never the same after that." *Id.* ¶ 9.

When Mary Beth Husing heard of the attack, she "was going to head over to [her] parents' house to tell them the good news that [she] was pregnant" but "held [her] news because [they] were all so focused on what might have happened to Brandan."  Decl. of Mary Beth Husing ("M. Husing Decl.") ¶ 5, ECF No. 21-2 at 23.  Waiting for "more news of Brandan for a long time," she "was worried and distressed."  *Id.* ¶ 6.  Once Brandan returned home, she noticed Brandan "seemed more quiet and reserved than [she] remembered" and "could tell he had been through some difficult experiences, and that the loss of his best friend weighed on him."  *Id.* ¶ 8.

### 2.  Servicemember Benjamin Samples and Three Family Members

On June 25, 1996, Benjamin Samples was an Air Force Security Officer in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers.  Decl. of Benjamin Shane Samples ("Samples Decl.") ¶¶ 2-4, ECF No. 21-2 at 25.  On the night of the bombing, Samples was in a vehicle at "the gate to leave the residential quarters" when "the blast rocked and shook the vehicle [he was] in, and [he] felt it reverberate through [his] body."  *Id.* ¶ 5.  Samples "realized [they] were under attack and turned the vehicle" toward the source of the blast.  *Id.* ¶ 6.  He "tried to provide some security near the blast area" and "established a rough perimeter around the core of the area."  *Id.* ¶ 9.  He had to stay in the Dhahran area for "approximately another 45 days."  *Id.* ¶ 11.  From that time, he recalls "the sight of so much blood everywhere" and that "[t]he smell was awful."  *Id.* ¶ 12.

After returning home, Samples "was angry all the time" and "found it hard to hold a job."  *Id.* ¶ 13.  Having "difficulty in his marriage," he and his wife divorced.  *Id.*  The psychological effects still "plague" Samples, who received a combined 80% disability rating from the VA, 70% attributable to PTSD.  *Id.* ¶¶ 15-16; *id.*, Ex. A, Benjamin Samples VA Disability Benefits Letter ("Samples VA Disability Rating"), ECF No. 21-2 at 29.  Neither Benjamin Samples' declaration

nor the documents submitted showing his VA Disability Rating specify what the remaining 10% of the 80% combined rating is attributable to, although he mentions "anxiety, chronic sleep difficulties, depressed mood, impairment of short and long term memory, and impaired impulse control." *Id.* ¶ 16.

Three of Benjamin's family members—his mother Carol Samples, former spouse Sandra Conard, and sister Meredith Kitchen—are also plaintiffs in this lawsuit. When Carol first heard about the bombing in a phone call while working at a nursing home, she "asked to be given the rest of the day off to return home." Decl. of Carol Samples ("C. Samples Decl.") ¶ 6, ECF No. 21-2 at 31. She "was anxious and terrified that Ben might have been hurt or possibly even killed" and "alternated between panic, anxiety, and hope." *Id.* ¶ 7. When Benjamin returned home, Carol "thought Ben was changed," as he "was more withdrawn and reserved" after the attack, which "was a life-changing experience for him" and "one that caused [her] great emotional distress when it happened and later on when [she] saw the effects on [her] son." *Id.* ¶ 11.

When Sandra Conard got a call from Benjamin's commanding officer informing her of the bombing, she "experienced deep anxiety and concern." Decl. of Sandra Conard ("S. Conard Decl.") ¶¶ 5-6, ECF No. 21-2 at 33. When "two white-uniformed military personnel" approached her door, her "emotional distress reached a very high level" and she "tried to suppress the thought that they were coming to let [her] know that Ben had died." *Id.* ¶ 7. When Benjamin returned home, Sandra noticed that he "seemed withdrawn," "was quick to anger," and "sometimes erupted into rants that seemed close to turning into violent actions" and made Sandra feel "threatened." *Id.* ¶ 9. Before the attack, Benjamin was a "cheerful and steady young man." *Id.* ¶ 11. After the attack, "he seemed to struggle with inner demons but wouldn't open up about them." *Id.* Sandra found the changes in Benjamin "difficult for [her] to deal with." *Id.* ¶ 9. While she "can't say that

11

what Ben went through at the Khobar Towers in 1996 was the sole cause" of their divorce, "it certainly contributed to it." *Id.* ¶ 12.

When Meredith Kitchen first heard about the attack in a call from her mother, she "was frightened and worried." Decl. of Meredith Kitchen ("M. Kitchen Decl.") ¶ 7, ECF No. 21-2 at 36. When Benjamin returned home, "[h]e was not his usual outgoing and cheerful self," "avoided crowds and seemed more short-tempered," and "was prone to expressions of 'road rage.'" *Id.* ¶ 8. He was also "less communicative," and Meredith "felt he distanced himself from [her] as well as from others." *Id.* ¶ 9. She "felt substantial emotional distress as a result of this loss" and the wait before learning Benjamin survived without any physical injury. *Id.* ¶ 10.

### 3. Servicemember Maxaminneo King and One Family Member

On June 25, 1996, Maxaminneo King was a Communications Tactical Systems Supervisor in the U.S. Army, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Maxaminneo King ("King Decl.") ¶ 2, 4-5, ECF No. 21-2 at 38. When the bomb detonated, King was "jarred out of [his] sleep by the explosion" and "fe[lt] the large and heavy window air conditioner unit just a few inches from [his] nose next to [him] on [his] pillow." *Id.* ¶¶ 6-7. After evacuating, since he was on a team "in charge of emergency communications," he went back into the building "with flashlights to try to set up communications" and "worked throughout the night," supplying "body bags and emergency air lifts . . . to evacuate the badly wounded back to Germany." *Id.* ¶¶ 12-14. King received an Air Force Achievement Medal with Valor for his work setting up emergency communications that night. *Id.* ¶ 15; *id.*, Ex. A, Maxaminneo King Air Force Achievement Medal Certificate, ECF No. 21-2 at 43.

In the aftermath of the attack, King "suffered severe consequences," experiencing "many symptoms of PTSD." *Id.* ¶ 17. While he continues to receive treatment, his "life has never been

the same since the attack," and "[n]ot a day goes by that [he doesn't] see and feel the A/C unit on the pillow next to [his] head, the darkness, the screams of others, and the panic of that night." *Id.* ¶¶ 17, 20. As "one of the few service members there who was in the Army" instead of the Air Force, he also feels "more isolated than most other Khobar survivors." *Id.* ¶ 19. King was rated 100% disabled by the VA due to PTSD alone. *Id.* ¶ 18; *id.*, Ex. B, Maxaminneo King Disability Benefits Letter ("King VA Disability Rating"), ECF No. 21-2 at 45.

King's daughter, Cykia Kenyatta King, is also a plaintiff in this lawsuit. Prior to the attack, Cykia and her father "had a very loving father and daughter relationship." Decl. of Cykia Kenyatta King ("C. King Decl.") ¶ 3, ECF No. 21-2 at 47. Cykia was approximately 13 years old at the time of the attack. *Id.* ¶ 2. Before the attack, Maxaminneo "was outgoing and sociable" and "spent a lot of time with [Cykia]." *Id.* When Cykia's mother told her about the bombing, she "was devastated and upset," feeling like her "whole life had been turned upside down." *Id.* ¶¶ 4-5. When her father returned home, Cykia noticed that "he was not the same person and [their] relationship as father and daughter was never the same" as he, "tormented by inner demons that [she] could not know about," grew "more distant and less involved in [her] life." *Id.* ¶¶ 6-7. Once, Maxaminneo "jumped out of bed and was crouching next to it," and Cykia realized that he "was re-living what had happened to him." *Id.* ¶ 8. She feels that she "lost a very loving and involved parent in 1996." *Id.* ¶ 11.

### 4. Servicemember Richard Lee Dobbins and Two Family Members

On June 25, 1996, Richard Lee Dobbins was an Aircraft Maintenance Planning and Control Specialist in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Richard Lee Dobbins ("Dobbins Decl.") ¶¶ 3-5, ECF No. 21-1 at 49. At the time of the bombing, he was in his dorm room. *Id.* ¶ 5. When the bomb detonated, he "felt a rush of

wind above [his] face" and "metal shutters on the window above [his] head protruding over [his] bed and into the room." *Id.* Following the bombing, he "crawled over the rubble to find where people were buried or stuck," "pulled quite a few people out of the rubble and enabled them to be carried off to receive medical care," and "went back and also pulled others who were no longer alive out of there." *Id.* ¶ 7. He "spent the next 7 or 8 hours helping to sew up the wounded, even though [he] had no prior medical experience." *Id.* ¶ 9.

Since the bombing, Dobbins has "nightmares," "emotional problems," and PTSD. *Id.* ¶ 12. He experiences "hypervigilance and an acute 'flight or fight' response to ordinary everyday situations." *Id.* For example, "any sort of shaking, such as a small earthquake [he] was in" or "any news story on the television about a violent attack or a bombing," "triggers intense fear." *Id.* ¶ 16. He and his wife divorced around 2002, and, in his view, "a lot of the problems [they] had were caused by what [he] now realize[s] is PTSD." *Id.* ¶ 12. He applied for a VA disability rating but had not received one at the time plaintiffs' motion was filed. *Id.* ¶ 14.

Two of Dobbins' family members—his former spouse Stephanie Burwell Guzik and daughter Alexandra Katherine Burwell Dobbins—are also plaintiffs in this lawsuit. Stephanie does not recall how exactly she heard of the attack but possibly heard through "word of mouth from other relatives of Airmen stationed there." Decl. of Stephanie Burwell Guzik ("S. Guzik Decl.") ¶ 5, ECF No. 21-2 at 57. Watching the news, she "felt terrible" and "worried that Richard may have been killed or severely injured." *Id.* ¶ 6. After speaking to someone in his squadron, she initially "felt relieved and reassured," but the uncertainty regarding Richard's life and condition "started [her] cycle of anxiety and worry over again." *Id.* ¶¶ 6-7. When she couldn't explain to her daughter "why anyone would want to hurt her daddy," she "broke down and cried." *Id.* ¶ 8. When Richard finally returned home, Stephanie "noticed some changes in Richard" over time, as

14

he "didn't want to talk about what had happened" and "became very controlling," "short tempered[,] and aggressive," all of which "escalated to an incident of domestic violence." *Id.* ¶¶ 10-11. She and Richard divorced in 2002, and she believes he "was neither a good husband nor a good father" after the attack and has "no doubt that the trauma of that attack and its aftermath caused this change in Richard." *Id.* ¶¶ 13-14.

Their daughter, Alexandra Katherine Burwell Dobbins, was four years old when the attack happened. Decl. of Alexandra Katherine Burwell Dobbins ("A. Dobbins Decl.") ¶ 3, ECF No. 21-2 at 60. While her "recollection of that time is hazy," she recalls "there was a day when [her] mother was watching the news a lot and seemed very upset about something." *Id.* When Richard returned, she remembers that he "seemed 'checked out' of any parenting role," becoming "distant, uninvolved, and emotionally unavailable." *Id.* ¶ 9. She now realizes that "turmoil between [Richard] and [her] mother was because of his PTSD," and that "there is a good chance they would never have gotten divorced were it not for the after-effects of what he went through at the Khobar Towers attack." *Id.* ¶ 10.

### 5. Three Family Members of Greg Leinenbach

Greg Leinenbach is a servicemember, who was injured in the Khobar Towers bombing and was a plaintiff in *Akins*, in which litigation he received an award of $5,000,000 based, *inter alia*, on his 50% VA Disability Rating and description of his injuries. *Akins*, 332 F. Supp. 3d at 23, 41. Three of his family members—his father Gary Leinenbach, Sr. ("Gary, Sr."), brother Gary Leinenbach, Jr. ("Gary, Jr."), and sister Shannon Leinenbach—are plaintiffs in this lawsuit.

Gary, Sr., and Greg "were all part of a close and loving family," and "remained very close" after Greg enlisted in the Air Force. Decl. of Gary Leinenbach, Sr. ("G. Leinenbach, Sr. Decl.") ¶¶ 3-4, ECF No. 21-2 at 63. When Gary, Sr., saw the attack on television, he "was in shock." *Id.*

15

¶ 5. The wait "was . . . very hectic and agonizing," and "very painful" during the few days before he heard from Greg. *Id.* ¶ 7. After Greg returned, he was "quick to anger," "seemed to withdraw from social activities," and "didn't really want to talk about what had happened to him." *Id.* ¶ 9. Gary, Sr., feels "bad for Greg and for [their] whole family" and "a lot of anger toward the people who did this." *Id.* ¶ 10.

Gary, Jr., was "at college when [his] dad called to tell [him] the terrible news" about the bombing, which news left him feeling "distraught, not knowing whether Greg had survived or whether he was badly hurt." Decl. of Gary Leinenbach, Jr. ("G. Leinenbach, Jr. Decl.") ¶¶ 6-7, ECF No. 21-2 at 65. Since Greg returned, "he [i]s different" and "has to excuse himself to leave" if "in a larger stadium or before large crowds." *Id.* ¶ 9. Gary, Jr., "kn[ows] [Greg] ha[s] been through a lot," and he still "shows signs of what he has been through." *Id.*

Shannon Leinenbach was "deeply worried and distressed" when she saw a news story about the attack on Khobar Towers, and she called her father, who "confirmed [her] worst fears" that Greg had been at Khobar Towers during the attack. Decl. of Shannon Leinenbach ("S. Leinenbach Decl.") ¶ 5, ECF No. 21-2 at 67. Shannon and Greg "always had a good brother-sister relationship." *Id.* ¶ 3. Before the attack, Shannon had known Greg as a "cheerful outgoing person." *Id.* ¶ 7. After the attack, she "could tell he had been through something traumatic," but the "terrible" attack "drew [the family] closer together." *Id.* ¶¶ 7-8.

### 6.  Two Family Members of Tracy Matt Winter

Tracy Matt Winter is a servicemember, who was injured in the Khobar Towers bombing and was a plaintiff in *Akins*, in which litigation he received an award of $2,500,000 based, *inter alia*, on his 70% VA Disability Rating, and the fact that he suffered "severe emotional injury accompanied by relatively minor physical injuries." *Akins*, 332 F. Supp. 3d at 27, 41 (quoting

16

*Khaliq v. Republic of Sudan*, 33 F. Supp. 29, 33 (D.D.C. 2014)). Two of his family members—brother Anthony Winter and sister Shannon Stiles—are plaintiffs in this lawsuit.

When Anthony Winter heard of the attack from his own Marine commander while he "was out on field training exercises," he was "anxious and worried." Decl. of Anthony Winter ("A. Winter Decl.") ¶¶ 6-7, ECF No. 21-2 at 69. Growing up, Anthony "admired" his brother, who "influenced [him] to enlist in the Marines." *Id.* ¶¶ 3-4. After the attack, Tracy was "no longer outgoing" as he had been before the attack. *Id.* ¶ 9. "Tracy had some other misfortunes" that Anthony believes "were related to the psychological effects of the bombing." *Id.* ¶ 10. At one point, Tracy was in jail and could not arrange the funeral of his "young son" who "died in an accident," so Anthony handled it, believing that Tracy ending up in jail "was as a result of what the bombing did to [Tracy]." *Id.* ¶ 11. While "Tracy is doing better," Anthony believes he "has never forgotten what happened" at the attack that "had a life-changing effect on him and all of [them] in the family." *Id.* ¶ 12.

Shannon Stiles was working at a restaurant with her mother when she heard of the attack and was "extremely concerned and worried" and "terrified that [she] may have lost [her] brother." Decl. of Shannon Stiles ("S. Stiles Decl.") ¶¶ 5-6, ECF No. 21-2 at 72. Before the attack, Shannon "felt close to [Tracy]" and "was pleased that he did stay in touch" after enlisting in the Air Force. *Id.* ¶¶ 3-4. After the attack, Tracy "was not the same person or the same personality" and "broke up with his girlfriend," who he had been with since high school. *Id.* ¶ 7. She is "pretty sure" the "attack and its aftermath have hurt him a lot" and "all of [them] in the family." *Id.* ¶ 8.

### 7. Five Family Members of Eric Ziegler

Eric Ziegler is a servicemember, who was injured in the Khobar Towers bombing and was a plaintiff in *Akins*, in which litigation he received an award of $5,000,000 based, *inter alia*, on his

100% VA Disability Rating. *Akins*, 332 F. Supp. 3d at 24, 41. Five of his family members—mother Sheryl Ziegler, daughter Sarah Nordin, brother Andrew Ziegler, and sisters Rhonda Crabtree and Amy Ziegler—are plaintiffs in this lawsuit. When Sheryl heard about the attack on the radio, she "felt a terrible chill go through [her] whole body" and was "extremely distressed and worried" that "something very bad had happened to Eric." Decl. of Sheryl Ziegler ("S. Ziegler Decl.") ¶ 6, ECF No. 21-2 at 74. While she "was so glad to hear that he was alive," she "was still very distressed and worried" to "not know the full extent of his injuries." *Id.* ¶ 8. She knows that what Eric "had been through must have been traumatic and had taken a psychological toll on him" and that "he suffered more than [she] knew at the time." *Id.* ¶¶ 10-11.

Sarah Nordin was less than one year old when the attack happened and has "no recollection of being told about it at the time." Decl. of Sarah Nordin ("S. Nordin Decl.") ¶ 3, ECF No. 21-2 at 77. Her mother told her about the attack when she was growing up, and she realized over time "how much it had affected [her] father and his relationship with all his children, including [her]." *Id.* ¶ 3. While Sarah enjoyed spending time with Eric, she "quickly realized . . . that he was physically impaired," which she felt "held him back and deprived [her] of some elements of his companionship." *Id.* ¶ 7. While Sarah felt Eric "cared for [her] and showed [her] some affection and warmth," she also noticed "he seemed distant and pre-occupied much of the time." *Id.* ¶ 10. Sarah believes "that this distance and lack of presence [were] because of the after-effects of what he experienced at the attack," and she "missed having a father who was more involved and present in [her] life." *Id.* ¶¶ 10-11.

Andrew Ziegler was "distraught" when he heard about the "traumatic" news of the bombing in a call from his mother. Decl. of Andrew Ziegler ("An. Ziegler Decl.") ¶¶ 8-9, ECF No. 21-2 at 80. He and Eric were "very close and part of a loving family." *Id.* ¶ 3. Before the

18

attack, Eric was an "upbeat cheerful older brother" to Andrew. *Id.* ¶ 11. After Eric returned, while "[i]t was good to see Eric in the flesh, even though he was still in a hospital bed and all bandaged up," Andrew has realized over time that "Eric came back from that experience a changed man," suffering from "physical injuries" and "some psychological harm." *Id.* ¶¶ 10-11.

Rhonda Crabtree felt "very upset and worried that [she] might have lost [her] brother" when she heard about the attack on the radio and in a call with her mother, after which she "was allowed to go home early from work." Decl. of Rhonda Crabtree ("R. Crabtree Decl.") ¶ 5, ECF No. 21-2 at 82. Prior to the attack, she "felt very close to [Eric][,] and sometimes when he was disciplined for acting up [she] would be the one who ended up crying." *Id.* ¶ 3. After the attack, although Rhonda and Eric "got back to having a good brother/sister relationship," she noticed that he "never wanted to talk much about what had happened." *Id.* ¶ 7. She knows "[the family] lost a part of him that will never come back," but believes that Eric "is a better person now because of everything he has gone through," and that they are "closer than [they] were." *Id.* ¶ 8.

When Amy Ziegler had to look after her "three young children" instead of visiting Eric in the hospital after the attack, she cried "off and on for three days" and "felt awful" after hearing the news of the attack, which "hit [her] like a ton of bricks." Decl. of Amy Ziegler ("Am. Ziegler Decl.") ¶¶ 8-9, ECF No. 21-2 at 84. Before the attack, she and Eric were "very close and part of a loving family." *Id.* ¶ 3. When Amy's parents returned from visiting Eric in the hospital and told Amy about his injuries, she was "frightened for Eric." *Id.* ¶ 10. After Eric finally returned home, "it was clear" to Amy that Eric "had gone through something horrific" and "seemed quieter and more withdrawn." Over the years, Eric revealed what happened the day of the attack, which "sounded terrible" to Amy. *Id.* ¶ 11.

19

### 8.   One Family Member of Steven Aceto

Steven Aceto is a servicemember, who was injured in the Khobar Towers bombing and was a plaintiff in *Aceto*, in which litigation he received an award of $3,000,000 based, *inter alia*, on his 50% VA Disability Rating, and the fact that he received "minor shrapnel injuries." *Aceto*, 2020 WL 619925, at *3, *19.  His brother Allan Aceto is a plaintiff in this lawsuit.  Allan heard about the attack in a call from his mother, and "felt a lot of distress, concern, and worry about [Steven]." Decl. of Allan Aceto ("A. Aceto Decl.") ¶¶ 5-6, ECF No. 21-2 at 87.  When Steven returned, Allan noticed that while Steven "seemed outwardly ok," he "thought something was bothering [Steven] from the inside" and that "he had gone through a lot." *Id.* ¶ 7.  The attack had a "huge effect" on Steven, Allan, and their mother.  *Id.* ¶ 8.  Allan has "taken anxiety medication since that time." *Id.*

### 9.   One Family Member of Shelley Cohen

Shelley Cohen is a servicemember, who was injured in the Khobar Towers bombing and was a plaintiff in *Aceto*, in which litigation she received an award of $3,000,000 based, *inter alia*, on the cuts she received in the bombing and the psychological symptoms she has suffered since. *Aceto*, 2020 WL 619925, at *6, 19.[4]  Her sister Summer Fleming is a plaintiff in this lawsuit. Summer learned about the attack from her mother, whose "fear and panic conveyed itself to [Summer] as well."  Decl. of Summer Fleming ("S. Fleming Decl.") ¶ 6, ECF No. 21-2 at 89. While Summer "felt like a great weight was lifted off [her] shoulders" when she heard that Shelley was alive, *id.* ¶ 8, Shelley had more deployments after the attack, and Summer "had to witness and experience [her] mother's depression and 'pick up the pieces' where [her] mother could not." *Id.* ¶ 10.  She "watched [her] mother deteriorate from this depression up until the time of her death, causing [Summer] much sorrow and sadness along the way." *Id.*  When Shelley finally returned

---

[4]   Cohen did not submit a VA Disability Rating in *Aceto*.  2020 WL 619925, at *6, 19.

home, "she seemed more distant and reserved." *Id.* ¶ 12.  Summer "felt like a part of [Shelley] had been walled off" and was "distressed to see the changes in [her] older sister." *Id.* ¶ 13-14.

### 10. One Family Member of Juan Antonio Manrique

Juan Antonio Manrique is a servicemember who was injured in the Khobar Towers bombing and was a plaintiff in *Thole*, in which litigation he received an award of $6,000,000 based, *inter alia*, on his PTSD and 50% VA Disability Rating attributable to the Khobar Towers bombing. *Thole*, 2024 WL 2208208, at *6, *14.  His brother Norberto Manrique is a plaintiff in this lawsuit. Norberto was "sitting at home eating a meal and watching the tv news" when he heard of the attack, after which he "spoke to [his] mom about it on a phone call" and "shared [his mother's] concern and felt terrible."  Decl. of Norberto Manrique ("N. Manrique Decl.") ¶¶ 6-8, ECF No. 21-2 at 92.  After the attack, "[Juan] was more short tempered and impatient, even with [their] mom, which concerned [Norberto]."  *Id.* ¶ 11.  After Juan sought help for his PTSD, Norberto noticed a "significant change for the better," and the brothers "got back in touch with [their] shared sense of humor."  *Id.* ¶ 12.  Still, Norberto is "angry and distressed at what the perpetrators of this terrorist attack" did.  *Id.* ¶ 13.

### 11. Three Family Members of Todd Akins

Todd Akins is a servicemember, who was injured in the Khobar Towers bombing and was a plaintiff in *Akins*, in which litigation he received an award of $5,000,000 based, *inter alia*, on his 70% VA Disability Rating, and his physical and psychological injuries.  *Akins*, 332 F. Supp. 3d at 13, 41.  His mother Carolyn Wells Kuhn, brother Bruce Akins, and sister Karen Erdman are plaintiffs in this lawsuit.  Carolyn "froze" and "had a tremendous sense of dread" when she saw the bombing on television.  Decl. of Carolyn Wells Kuhn ("C. Kuhn Decl.") ¶ 5, ECF No. 21-2 at 95.  As she waited for more news, her "initial sense of hope turned to depression."  *Id.* ¶ 6.  When

Todd returned home, Carolyn "was thankful to see him all in one piece" but "thought he was different in some ways," "seemed quieter and withdrawn," and "was less optimistic and more guarded." *Id.* ¶¶ 8-9. The "mental and emotional struggle" that Todd went through since the attack "caused [Carolyn] a lot of distress" as she was "greatly saddened and angered that he had to go through such a terrible experience." *Id.* ¶¶ 9-10.

Bruce Akins was "terrified" and "shaken" when he learned of the attack in a call from his mother. Decl. of Bruce Akins ("B. Akins Decl.") ¶¶ 6-7, ECF No. 21-2 at 98. Before the attack, Bruce and Todd "were very close" as "Todd looked up to [Bruce] and [Bruce] looked after [Todd] as [his] little brother." *Id.* ¶ 3. Bruce was "protective and became a father figure to [Todd]" after their parents' divorce. *Id.* ¶ 4. After the attack, Bruce felt "relief that [Todd] had survived all in one piece" but "saw that he had been damaged, both physically and mentally," "seemed to have lost some of the joy and optimism he had as a young man," and "was more somber." *Id.* ¶ 9. Although Todd was "probably not ready to deal with it" at first, Bruce thinks Todd "has continued to work through the traumatic experience" over the years. *Id.* ¶ 10.

Karen Erdman felt "horrible" when she heard of the attack in a call from her mother, and "[s]itting and waiting was agonizing." Decl. of Karen Erdman ("K. Erdman Decl.") ¶ 5, ECF No. 21-2 at 101. Before the bombing, Karen remembers Todd "as a very active kid," who "was always involved with everything going on." *Id.* ¶ 3. After the attack, Karen noticed over time that Todd "wasn't the same person" as he was "more reserved," and "there were some barriers that had not been there before." *Id.* ¶ 7.

### 12. One Family Member of Cielito Valencia

Cielito Valencia is a servicemember, who was injured in the Khobar Towers bombing and was a plaintiff in *Valencia*, in which litigation he received an award of $5,000,000 based, *inter*

*alia*, on his physical injuries and severe, lingering psychological effects. *Valencia*, 774 F. Supp. 2d at 15-16.[5] His father Ricardo Tejada is a plaintiff in this lawsuit. Before the attack, Ricardo "loved [his] son Cielito and followed his growth and development carefully and with great longing and love." Decl. of Ricardo G. Tejada ("R. Tejada Decl.") ¶ 5, ECF No. 21-2 at 103. When Cielito moved at age 14 from the Philippines to Greece to join his mother, to whom Ricardo was not married, Ricardo "learned what [he] could about Cielito's whereabouts and development from mutual friends in the neighborhood." *Id.* ¶ 6. When Ricardo heard of the attack that left his son "badly injured," he was "deeply distressed and felt very bad for a long time." *Id.* ¶ 7. Several years later, when Ricardo finally got to see Cielito, who brought his own son to meet him, he "cried for a very long time" because of Cielito's "very evident" injuries. *Id.* ¶ 8. He has seen Cielito "several more times since then," and "was very moved that [Cielito] still remembers [him] and holds [him] in high regard." *Id.* ¶ 9.

### D.  Procedural History

Plaintiffs filed this lawsuit on November 19, 2024, Compl., ECF No. 1, as related to *Jackson v. Islamic Republic of Iran*, No. 24-cv-2304 (BAH) (D.D.C.), *see* Not. of Related Case, ECF No. 2. On November 21, 2024, plaintiffs filed an amended complaint, adding one plaintiff—Noberto Manrique, Jr. *See* Am. Compl. ¶ 32. After filing the Amended Complaint, plaintiffs, as discussed *infra* in Part III.B, properly served Iran with the Amended Complaint under the FSIA on September 28, 2025. *See* Return of Service/Aff. On December 4, 2025, after defendant failed to file an answer or enter an appearance, plaintiffs moved for and the Clerk of this Court entered default. Aff. for Entry of Def., ECF No. 16; Clerk's Entry of Def. as to Iran. Plaintiffs subsequently moved to substitute plaintiff Rosemary Johns, who recently passed away, with the

---

5        Valencia did not submit a VA Disability Rating in *Valencia*. 774 F. Supp. 2d at 16.

Estate of Rosemary Johns, of which her husband, plaintiff John Johns, is named as the executor, Pls.' Suggestion of Death, ECF No. 18; Pls.' Mot. to Substitute Party, ECF No. 19; Minute Order (Dec. 11, 2025), which motion was granted, Minute Order (Dec. 11, 2025).

On December 15, 2025, Plaintiffs filed a motion for default judgment as to liability and damages, Pls.' Mot., accompanied by copies of declarations and evidence to support their damages allegations, Pls.' Evidence in Supp. of Mot. for Default J. as to Liability & Damages ("Pls.' First Declarations"), Attach. 2, ECF No. 20-2. A day later, they filed an errata noting omissions and typographical errors, accompanied by a revised memorandum in support of their motion, Pls.' Mem., and a new set of plaintiff declarations, *id.*, Pls.' Decls., ECF No. 21-2.[6]

## II.   LEGAL STANDARD

"Rule 55(a) [of the Federal Rules of Civil Procedure] requires the Clerk to enter a default when a defendant 'has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise,'" and, "[o]nce the Clerk does so, the plaintiff may 'apply to the court for a default judgment' under Rule 55(b)." *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1023 (D.C. Cir. 2020) (quoting FED. R. CIV. P. 55(a), (b)(2)). Rule 55(b)(2) thus permits a court to consider entering a default judgment when a party applies for that relief. *See* FED. R. CIV. P. 55(b)(2). Since

---

[6]   On April 14, 2026, plaintiffs moved for expedited consideration of their motion for default judgment as to liability and damages because the U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund") set a June 1, 2026, deadline for holders of judgments against state sponsors of terrorism to submit applications for a round of disbursements from that fund. Pls.' Amend. Mot. to Expedite Consideration, ECF No. 23. This motion is denied as moot, since the June 1, 2026, deadline for application to the USVSST fund has passed. Given the Court's congested schedule and pendency of motions in other cases that became ripe before plaintiffs' motion, expedition was not possible. Additionally, by the time plaintiffs filed this motion, in mid-April, even a decision on their motion for default judgment would not have allowed them nearly enough time to serve Iran with the judgment, as required for application to the USVSST Fund. *See Frequently Asked Questions*, U.S. Victims of State Sponsored Terrorism Fund, https://www.usvsst.com/Home/Faq [https://perma.cc/N7VQ-M93E] (last visited July 2, 2026) ("In the case of a default judgment entered against a foreign state, the claimant must submit documentation showing . . . verified proof of service under 28 U.S.C. § 1608(a) and (e)."); Return of Service/Aff. (explaining that a filing submitted to the State Department on February 14, 2025, was not served on Iran until September 28, 2025); Pls.' Mot. to Expedite Consideration at 1-2 ("If the Court decides this case affirmatively and awards damages . . . [the judgment] would have to be translated into Farsi and service on Defendant Iran would have to be attempted pursuant to 28 U.S.C. Section 1608(a)(3) prior to the June 1 due date . . . .").

24

"strong policies favor resolution of disputes on their merits[,] '[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)). At the same time, the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether the court has subject-matter jurisdiction over the action. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). Consequently, "entry of a default judgment is not automatic." *Id.* at 6 (footnote omitted).

While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, the FSIA's state-sponsored terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim*, 774 F.3d at 1047-48; *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019). To this end, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (alterations accepted and omission in original) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)); *see also Klapprott v. United States*, 335 U.S. 601, 611 (1949) (observing that "statutes and rules have largely left for judicial determination the type of cases in which hearings and proof should precede default judgments").

25

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Han Kim*, 774 F.3d at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). Uncontroverted factual allegations that are supported by admissible evidence are taken as true. FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when the adverse party "fails to properly address another party's assertion of fact"); *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus*, 750 F. Supp. 2d at 171)).

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient,'" *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory," *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785). In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if 'there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted.'" *Owens*, 864 F.3d at 785 (omission in original) (quoting *Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)).

## III.   DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendant, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendant, and (4) the plaintiffs

have satisfactorily proven that they are entitled to the monetary damages they seek. These requirements are addressed *seriatim*.

## A. Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title." 28 U.S.C. § 1330(a). In this case, plaintiffs seek *in personam* relief, so the question is whether defendant Iran is entitled to immunity.[7]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 28 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13-14; *see also Doe v. Taliban*, 101 F.4th 1, 5 (D.C. Cir. 2024). In the instant case, plaintiffs assert jurisdiction based on the FSIA's terrorism exception, 28 U.S.C. § 1605A, *see* Am. Compl. ¶ 1, which provision was enacted "[i]n 1996, [when] Congress withdrew foreign sovereign immunity for lawsuits that seek money damages for personal injury or death from a state sponsor of terrorism that has engaged in an 'act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act,'" *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1057 (D.C. Cir. 2024) (quoting the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241); *see also Mark v. Republic of Sudan*, 77 F.4th 892, 895 (D.C. Cir. 2023). As the quoted text indicates, this

---

[7]   This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and defendant has "forfeited its affirmative defense . . . by failing to raise it" here, *Owens*, 864 F.3d at 804; *see also Maalouf*, 923 F.3d at 1114-15 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

27

exception also requires that "the foreign country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)), and also at that time of the act, "the 'claimant or the victim was' a 'national of the United States,'" *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)), or was a member of the armed forces, 28 U.S.C. § 1605A(a)(2)(A)(ii)(II).[8]

Plaintiffs have satisfactorily proven the applicable elements here. As already stated, Iran has been designated a state sponsor of terrorism since 1984, over a decade before the 1996 Khobar Towers bombing. Moreover, all but one of the plaintiffs have averred in sworn declarations that they are United States citizens.[9] The one plaintiff who was not a United States citizen at the time of the attack, Ricardo Tejada, bases his claim on his son—servicemember plaintiff Cielito Valencia—who was both a U.S. citizen and a member of the U.S. armed forces at the time of the Khobar Towers bombing. *See* R. Tejada Decl. ¶ 2 (describing his son's service in the Air Force at the time of the bombing); Pls.' Mem. at 31; *Valencia*, 774 F. Supp. 2d at 6-7 (noting that Cielito was born in the United States and has remained a citizen his entire life); *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 34-35 (D.D.C. 2016) (finding subject-matter jurisdiction to adjudicate claims of non-U.S.-citizen family members of U.S.-citizen victims under the FSIA's

[8]    Finally, the provision requires proof that, "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(A)(iii). Since the Khobar Towers attack took place in Saudi Arabia and not Iran, this requirement does not apply in this case.

[9]    *See* Johns Decl. ¶ 1 (attesting to the declarant's United States citizenship); J. Johns First Decl. ¶ 1 (same); J. Johns Second Decl. ¶ 3 (attesting to the U.S. citizenship of the decedent on whose behalf the declaration was filed); M. Husing Decl. ¶ 1 (attesting to the declarant's United States citizenship); Samples Decl. ¶ 1 (same); C. Samples Decl. ¶ 1 (same); S. Conard Decl. ¶ 1 (same); M. Kitchen Decl. ¶ 1 (same); King Decl. ¶ 1 (same); C. King Decl. ¶ 1 (same); Dobbins Decl. ¶ 1 (same); S. Guzik Decl. ¶ 1 (same); A. Dobbins Decl. ¶ 1 (same); G. Leinenbach, Sr. Decl. ¶ 1 (same); G. Leinenbach, Jr. Decl. ¶ 1 (same); S. Leinenbach Decl. ¶ 1 (same); A. Winter Decl. ¶ 1 (same); S. Stiles Decl. ¶ 1 (same); S. Ziegler Decl. ¶ 1 (same); S. Nordin Decl. ¶ 1 (same); An. Ziegler Decl. ¶ 1 (same); R. Crabtree Decl. ¶ 1 (same); Am. Ziegler Decl. ¶ 1 (same); A. Aceto Decl. ¶ 1 (same); S. Fleming Decl. ¶ 1 (same); N. Manrique Decl. ¶ 1 (same); C. Kuhn Decl. ¶ 1 (same); B. Akins Decl. ¶ 1 (same); K. Erdman Decl. ¶ 1 (same).

terrorism exception).  Finally, plaintiffs seek damages "for personal injury . . . that was caused by an . . . extrajudicial killing" for which defendant provided "material support or resources."  28 U.S.C. § 1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors.").

More specifically, the truck bombing that plaintiffs allege caused their injuries was manifestly an "extrajudicial killing" that resulted in the deaths of nineteen American military personnel.  *See, e.g.*, *Rimkus*, 750 F. Supp. 2d at 182 ("The actions of defendants constituted both an extrajudicial killing and the provision of material support in satisfaction of the first element of liability."); *Akins*, 332 F. Supp. 3d at 33-34 (concluding the same); *Aceto*, 2020 WL 619925, at *13 (same).  For the purposes of the FSIA terrorism exception, the term "extrajudicial killing" has the "meaning given" in "the Torture Victim Protection Act of 1991," 28 U.S.C. § 1605A(h)(7), which statute defines the term as "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)).

The Court additionally takes judicial notice of the evidence presented in *Blais* and *Heiser I* demonstrating that Iran provided "material support or resources" for the extrajudicial killing carried out in the Khobar Towers bombing.  As is clear from the evidence in those cases, described *supra* in Parts I.A-B, defendant planned, supported, and "approved" the attack.  *Heiser I*, 466 F. Supp. 2d at 252.  The evidence also shows that Iran played a key role in helping to recruit, train, fund, supply, and direct Saudi Hezbollah, including in specific preparation for the attack on the Khobar Towers, *id.* at 262, establishing that Iran's actions were "a 'substantial factor' in the

sequence of events that led to . . . plaintiff[s'] injur[ies]" and that the injuries were "'reasonably foreseeable or anticipated as a natural consequence' of [Iran]'s conduct," *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining that the jurisdictional standard for causation under the FSIA's terrorism exception is proximate cause).

Therefore, under 28 U.S.C. § 1605A, defendant, though a foreign sovereign, is not immune from this suit, meaning that subject-matter jurisdiction may be properly exercised. *See* 28 U.S.C. § 1330(a).

## B.  Personal Jurisdiction Under the FSIA

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]."  28 U.S.C. § 1330(b).  This section prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)-(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C. 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), because "defendant[] ha[s] neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

For this reason, plaintiffs attempted to effectuate service of the Amended Complaint under § 1608(a)(3) by sending one copy of the summons, complaint, and notice of suit, along with a translation of each document in Iran's official language, to Iran's Ministry of Foreign Affairs.  *See* Pls.' Aff. Requesting Foreign Mailing, ECF No. 8; Certificate of Clerk, ECF No. 10.  When this method of service was unsuccessful, plaintiffs, following § 1608(a)(4), transmitted two copies of the summons, complaint, and notice of suit, along with a translation of each document, to the U.S.

Department of State, *see* Pls.' Aff. Requesting Foreign Mailing, ECF No. 12; Certificate of Clerk, ECF No. 14, for service "through diplomatic channels," 28 U.S.C. § 1608(a)(4) (allowing resort to this method "if service cannot be made within 30 days under paragraph (3)"). On November 17, 2025, the U.S. Department of State certified that the requirements for diplomatic service, under Section 1608(a)(4), had been satisfied on September 28, 2025. Return of Service/Aff.

Plaintiffs' executed service in compliance with 28 U.S.C. § 1608(a)(4) authorizes the exercise of personal jurisdiction over Iran. *See* 28 U.S.C. § 1330(b); *CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 605 U.S. 223, 232 (2025) ("[T]he most natural reading of § 1330(b) is that personal jurisdiction over a foreign sovereign is 'automatic' whenever (1) 'an exception to immunity applies' and (2) 'service of process has been accomplished.'" (internal quotation marks and citation omitted)).

## C. Iran's Liability

Plaintiffs seek relief in four of the five counts of the Amended Complaint expressly under § 1605A(c) of the FSIA, which creates a private right of action for "personal injury or death" and provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c); *see also* Am. Compl. ¶¶ 43-54, 61-68. Under § 1605A(c), the four servicemember plaintiffs bring claims for assault and battery, *id.* ¶¶ 49-54 (Count II), seeking compensatory damages for "personal," "physical, emotional, and psychological" injuries, which resulted in "an immediate apprehension of harm," and "pain and suffering," *id.* ¶ 52; the twenty-six family member plaintiffs bring claims for loss of solatium, *id.* ¶¶ 61-64 (Count IV); and all thirty plaintiffs seek "punitive damages," *id.* ¶¶ 65-68 (Count V). All plaintiffs also include a general damages allegation under § 1605A(c). *Id.* ¶¶ 43-48 (Count I).

All plaintiffs also bring a claim for intentional infliction of emotional distress ("IIED") "under state and federal substantive law as made applicable by 28 U.S.C. Section 1606 as well as under 28 U.S.C. Section 1605A." *See* Am. Compl. ¶¶ 55-60 (Count III). The referenced "Section 1606" of the FSIA applies only when a "foreign state is not entitled to immunity under section 1605 or 1607" of the FSIA, 28 U.S.C. § 1606, and is therefore not applicable here, since Iran's immunity was excepted under the FSIA's § 1605A. *See supra* Part III.A. The only provision of § 1605A that makes substantive federal or state law applicable is § 1605A(c), the same provision cited in plaintiffs' other counts. Therefore, plaintiffs' Count III will be treated as having been brought under § 1605A(c), as well. [10]

Despite creating a private right of action that allows for the recovery of "economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c), Section 1605A(c) contains no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages. As a result, courts evaluating such claims "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353; *see also Est. of Heiser v. Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 24, 26 (D.D.C. 2009) (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability). The availability of these claims for each plaintiff is discussed below.

---

[10] Since defendant lacks sovereign immunity under § 1605A, *see supra* Part III.A, the country is also liable for its act of extrajudicial killing under ordinary causes of action that exist independently of the FSIA, such as those created by state or foreign law. To the extent plaintiffs intended to invoke any other cause of action, they do not explain what that might be. Liability will thus be assessed only under § 1605A(c).

### 1.  Four Servicemember Plaintiffs

The four servicemember plaintiffs were members of the Armed Services at the time of the attack and therefore are expressly covered by, and entitled to bring claims under, Section 1605A(c)(2).

#### a.  Assault and Battery

Battery requires an act "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly results."  Restatement (Second) of Torts § 13 (A.L.I. 1965).  "Harmful contact" causes a "physical impairment of the condition of another's body, or physical pain or illness."  *Id.* § 15; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76-77 (D.D.C. 2010) (defining these terms).  Iran acted with the intent to cause harmful contact with the residents of the Khobar Towers when it materially supported the truck bombing.  *See, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for terrorist attacks as an act intending to cause harm).  Of the four servicemember plaintiffs in this case, only Brandan Johns avers that some harmful physical contact resulted from the explosion of the bomb, which evidence is sufficient to prove that Iran is liable to Johns for battery.[11]  Servicemember plaintiffs Benjamin Samples, Maxaminneo King, and Richard Dobbins, on the other hand, have provided no evidence that they suffered a harmful or offensive physical contact against themselves from the bombing to support a battery claim.  *See generally* Samples Decl.; King Decl.; Dobbins Decl.

Assault, meanwhile, occurs when a defendant "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension."  Restatement (Second) of Torts

---

[11]    *See* Johns Decl. ¶¶ 6-7 (describing cuts from glass in several parts of his body, including his feet when walking on broken glass).

§ 21(1). "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs averred "that they did, in fact, fear such harm because of the attack," defendant may be held liable for assault. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76 (same). Imminence is defined as being "so close to striking distance that [one] can reach the other almost at once." Restatement (Second) of Torts § 29 cmt. b. All four servicemember plaintiffs, including those three who did not produce evidence of harmful physical contact, were at Khobar Towers at the time of the bombing, which was clearly within striking distance, given the impacts of the bomb on the whole Khobar Towers complex, and thus "were in imminent apprehension of harm," meaning that Iran is liable to all servicemember plaintiffs for assault. *Aceto*, 2020 WL 619925, at *15; *see also* Johns Decl. ¶ 6; Samples Decl. ¶ 5; King Decl. ¶ 6; Dobbins Decl. ¶ 5.

### b. IIED

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to" a plaintiff is liable for intentional infliction of emotional distress. Restatement (Second) of Torts § 46(1); *see also Heiser II*, 659 F. Supp. 2d at 26. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also Valore*, 700 F. Supp. 2d at 77 (same). Here, all four servicemember plaintiffs have demonstrated that they suffered severe emotional and psychological distress as a result of the Khobar Towers attack and may recover for IIED.[12]

---

[12]    Johns Decl. ¶ 16-17 (PTSD, sleep problems, anxiety, and depression); Samples Decl. ¶¶ 14-16 (PTSD, anxiety, chronic sleep difficulties, depression, impairment of short- and long-term memory, and impaired impulse control); King Decl. ¶¶ 17-18, 20 (PTSD); Dobbins Decl. ¶¶ 12-13, 16 (PTSD and sleep problems).

## 2. Family Member Plaintiffs

The remaining twenty-six plaintiffs seek damages as family members of servicemembers present in Dhahran, Saudi Arabia, for the Khobar Towers bombing. Nine of these plaintiffs—John Johns, the estate of Rosemary Johns, Mary Beth Husing, Carol Samples, Sandra Conard, Meredith Kitchen, Cykia King, Stephanie Guzik, and Alexandra Dobbins—are family members of servicemember plaintiffs in this suit. Two of the family member plaintiffs—Allan Aceto and Summer Fleming—are family members of two servicemembers awarded compensatory damages in *Aceto*. Thirteen of the family member plaintiffs—Gary Leinenbach, Sr., Gary Leinenbach, Jr., Shannon Leinenbach, Anthony Winter, Shannon Stiles, Sheryl Ziegler, Sarah Nordin, Andrew Ziegler, Rhonda Crabtree, Amy Ziegler, Carolyn Kuhn, Bruce Akins, and Karen Erdman—are family members of four servicemembers awarded compensatory damages in *Akins*. One family member plaintiff—Norberto Manrique—is a family member of a servicemember awarded compensatory damages in *Thole*. One additional family member plaintiff—Ricardo Tejada—is a family member of a servicemember awarded compensatory damages in *Valencia*.

The family members rest their claim of liability on IIED via the private right of action afforded in 28 U.S.C. § 1605A(c). *See* Am. Compl. ¶¶ 55-60 (Count III, IIED); *id.* ¶¶ 61-64 (Count IV, seeking damages for solatium). The Restatement permits recovery for those who were not a direct target of a defendant's conduct if (1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present" and (2) the claimant is a member of a victim's immediate family, *Heiser II*, 659 F. Supp. 2d at 26-27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307 (2000)), or the functional equivalent of an immediate family member, *see Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under the FSIA for IIED to "members of the victim's household" who were "viewed as

35

the functional equivalents of immediate family members"); *see also* Restatement (Second) of Torts § 46, cmt. l (leaving "open the possibility of situations in which presence . . . may not be required").

All family members are immediate family members—spouses, parents, siblings, and children—of servicemember victims injured in the Khobar Towers attack.  *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (observing that the "strict meaning" of immediate family is "one's spouse, parents, siblings, and children" (quoting *Heiser II*, 659 F. Supp. 2d at 28)).

After discussing the eligibility to sue of Ricardo Tejada—the only plaintiff who is not a U.S. national—and the estate of Rosemary Johns, Iran's liability for IIED is analyzed.

### a.  *Non-U.S.-National Family Member Plaintiff*

Plaintiff Ricardo Tejada is not a "national of the United States" and therefore cannot recover under the private right of action created in 28 U.S.C. § 1605A(c).  Section 1605A(c) makes state sponsors of terrorism liable to U.S. nationals and certain other categories of individuals not relevant here.  *Id.* § 1605A(c)(1).  A "national of the United States," defined by reference to 8 U.S.C. § 1101(a)(22), *see* 28 U.S.C. § 1605A(h)(5), is a citizen of the United States or "a person who, though not a citizen of the United States, owes permanent allegiance to the United States," 8 U.S.C. § 1101(a)(22).  "The sole . . . statutory provision that presently confers United States nationality upon non-citizens is 8 U.S.C. § 1408," which covers people born in or having some connection to outlying possessions of the United States.  *Mohammadi*, 782 F.3d at 15.

Ricardo Tejada is a citizen and resident of the Philippines, where he has lived all his life, R. Tejada Decl. ¶ 3, and therefore is not a "national of the United States" under § 1605A(c).  While § 1605A(a) abrogates Iran's immunity against Tejada's claim—because the victim of the attack, Tejada's son Cielito, was a U.S. citizen—Tejada must rely upon a substantive source of liability other than § 1605A(c).  *See* 28 U.S.C. § 1605A.  Tejada may bring claims "under 'applicable state

and/or foreign law,'" *Thuneibat*, 167 F. Supp. 3d at 41 (quoting *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 572 (7th Cir. 2012)), typically either the law of the place where the attack occurred, the law of the forum state, or the law of the domicile country of the plaintiff, *id.* (citing *Owens*, 826 F. Supp. 2d at 154), in this case the Philippines, R. Tejada Decl. ¶ 3.  To bring such claims, Tejada must "identify the specific source of law . . . at an appropriate time in the litigation . . . by identifying [his] causes of action."  *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 840 (D.C. Cir. 2009); *see also Thuneibat*, 167 F. Supp. 3d at 41-47 (conducting choice-of-law analysis and applying Jordanian law identified by plaintiffs as a basis for liability).  Tejada has not done so. Although Count III of the Amended Complaint invokes "state and federal substantive law" generally, *see* Am. Compl. ¶ 58, this does not constitute a cause of action on which liability may rest.  Thus, his request for damages is denied, without prejudice.

### b.  Deceased Family Member Plaintiff

One family member plaintiff, Rosemary Johns, is deceased and is represented by her estate. As evidence that her husband, John Johns, represents her estate, plaintiffs present Rosemary's will, which names John as the executor of her estate.  *See* J. Johns Second Decl., Ex. A, R. Johns Last Will and Testament ¶ 6, ECF No. 21-2 at 19.  Plaintiffs present no evidence, however, that John has been recognized or appointed by a court or registrar as the executor of Rosemary's estate.

Courts in this district have previously awarded damages to the estates of deceased servicemembers and the estates of deceased relatives of victims of terrorist attacks.  *See, e.g.*, *Est. of Johnson*, 2024 WL 3225954, at *14; *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 37-38 (D.D.C. 2020).  "When, such as here, an estate-plaintiff brings an action under [the] FSIA's private cause of action, the plaintiff must first establish the estate's standing, or [its] power . . . to bring and maintain legal claims."  *Barry*, 437 F. Supp. 3d at 36 (alterations in original) (quoting

37

*Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017)).  Standing of an estate is governed by the law of the state which governed the creation of the estate.  *Id.* (citing *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014)).  Yet, plaintiffs' briefing is silent as to the standing of John Johns as estate representative, under the law of the state in which the estate is established, to assert claims here on behalf of the estate.  *See generally* Pls.' Mem. at 12.  In this circumstance, the claims of the estate representatives have in other cases been dismissed without prejudice.  *See, e.g.*, *Strauss v. Islamic Republic of Iran*, No. 22-cv-52 (RCL), 2024 WL 2499922, *2 (D.D.C. Mar. 28, 2024) (noting that when plaintiffs have not "presented any evidence as to what the applicable [state] law says about the availability of damages for pain and suffering," the court "need not divine this information nor scour through foreign treatises").

While Pennsylvania allows the personal representative of an estate to initiate or maintain personal injury claims on behalf of the decedent's estate, *see* 20 PA. C.S.A. §§ 3371, 3373 (2025); 42 PA. C.S.A. § 8302, and Rosemary designated her husband John as the executor, *see* R. Johns Last Will and Testament ¶ 6, John has not provided evidence that has obtained "[l]etters testamentary [which] shall be granted by the register to the executor designated in the will," to make him formally a representative of the estate, *see* 20 PA. C.S.A. § 3155(a).  Without showing he has the power to prosecute claims on Rosemary's behalf under Pennsylvania law, John cannot maintain a claim for her estate.  Thus, the claims of Rosemary Johns' estate are dismissed, without prejudice.  "[A]ll FSIA plaintiffs [must] ensure that their motions for default include evidence and argument as to any applicable state law." *Est. of Farhat v. Islamic Republic of Iran*, No. 19-cv-3631 (RCL), 2024 WL 706971, at *16 (D.D.C. Feb. 21, 2024).

*    *    *

38

Defendant is thus liable for IIED to twenty-four of the family-member plaintiffs. Defendant's conduct in materially supporting Saudi Hezbollah was "sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] [wa]s not present," such that a victim's immediate family members need not have been at the bombing to recover for their emotional distress. *Heiser II*, 659 F. Supp. 2d at 27 (quoting DOBBS, *supra*, § 307); *see Schooley*, 2019 WL 2717888, at *73 (concluding the same); *Akins*, 332 F. Supp. 3d at 37-38 (same). Finally, the family member plaintiffs have shown, through their uncontested declarations, that they suffered significant emotional consequences from the attack, both in the days spent waiting for news of their loved ones and in the years after the attack.[13]

Four servicemember plaintiffs and twenty-four family member plaintiffs have established defendant's liability under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of assault, battery, and intentional infliction of emotional distress, as outlined above.

**D. Damages**

Turning to the allowable damages, plaintiffs seek to recover pain and suffering, solatium, and punitive damages. Pls.' Mem. at 10, 31 (requesting these three types of damages). The damage awards to which each plaintiff is entitled are described below.

**1. Legal Standard for Damages under Section 1605A(c)**

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including "economic damages, solatium, pain and suffering, and punitive

---

[13]     *See* J. Johns First Decl. ¶¶ 6-7; M. Husing Decl. ¶¶ 6-7; C. Samples Decl. ¶¶ 7, 11; S. Conard Decl. ¶¶ 6-7, 9; M. Kitchen Decl. ¶¶ 7-10; C. King Decl. ¶¶ 4-5, 7, 11-12; S. Guzik Decl. ¶¶ 6-7, 11; A. Dobbins Decl. ¶¶ 5-9; G. Leinenbach, Sr. Decl. ¶¶ 7, 10; G. Leinenbach, Jr. Decl. ¶¶ 7, 9-10; S. Leinenbach Decl. ¶¶ 5-8; A. Winter Decl. ¶¶ 7, 9, 12; S. Stiles Decl. ¶¶ 5-8; S. Ziegler Decl. ¶¶ 6, 8, 11; S. Nordin Decl. ¶¶ 7, 11; An. Ziegler Decl. ¶¶ 9, 11; R. Crabtree Decl. ¶¶ 5, 7-8; Am. Ziegler Decl. ¶¶ 9-11; A. Aceto Decl. ¶¶ 6, 8; S. Fleming Decl. ¶¶ 6, 12, 14; N. Manrique Decl. ¶¶ 8, 11-13; C. Kuhn Decl. ¶¶ 5, 9-10; B. Akins Decl. ¶ 7, 9; K. Erdman Decl. ¶ 5, 7.

damages." 28 U.S.C. § 1605A(c). To recover, the plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (internal quotation marks omitted) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115-16 (D.D.C. 2005)); *see also Fraenkel*, 892 F.3d at 353 (stating the same). Courts may look to expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). The D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion." *Fraenkel*, 892 F.3d at 356.

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed above, has satisfactorily shown that the plaintiffs' injuries were reasonably certain and were the intended consequences of the defendant's material support of Saudi Hezbollah. *See Est. of Johnson*, 2024 WL 3225954, at \*13 (concluding the same); *Schooley*, 2019 WL 2717888, at \*74 (same); *Akins*, 332 F. Supp. 3d at 39 (same). Having concluded this, whether plaintiffs have shown the amount of pain and suffering and solatium damages by a reasonable estimate will be considered next.

### 2. Pain and Suffering

As previously discussed, *see supra* Part III.C, defendant is liable to four servicemember plaintiffs for a combination of battery, assault, and intentional infliction of emotional distress, but the bar on multiple recoveries allows these plaintiffs to recover only under one theory, for the single underlying harm. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such

theories, as multiple recovery is prohibited."). Within this single-recovery framework, the "baseline assumption" applied in previous cases under the FSIA's terrorism exception is that "'persons suffering injuries in terrorist attacks are entitled to $5 million in damages.'" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). This baseline, in turn, may be adjusted either upward or downward, based on individual circumstances. An upward departure would be warranted "in the presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, . . . or were mistaken for dead.'" *Id.* at 35-36 (quoting *Valore*, 700 F. Supp. 2d at 84). A downward departure would be warranted "in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'" *Id.* at 36 (quoting *Valore*, 700 F. Supp. 2d at 84).

Pain and suffering damages are by their nature difficult to quantify. In *Schooley*, this Court relied in part on an "objective metric"—the VA disability rating—to "determin[e] the relative degree of injury suffered by each service member plaintiff." *Schooley*, 2019 WL 2717888, at *74. That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id.* (internal quotation marks omitted). As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards. *Id.*; *cf. Khaliq v. Republic of Sudan*, 33 F. Supp. 3d at 33 ("When calculating damages amounts, 'the Court must take pains to ensure that individuals with similar injuries receive similar awards.'" (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007))).

41

*Schooley*'s basic rubric is adopted in this case for the three servicemember plaintiffs with relevant VA disability ratings.  Under this rubric, servicemember plaintiffs rated by the VA up to 30% disabled due to their service injuries stemming from the Khobar Towers attack receive a baseline award of $5,000,000; plaintiffs rated 40 to 60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and servicemember plaintiffs rated 70 to 100% disabled by the VA will receive a further upward departure, for a total of $7,000,000.  *See, e.g.*, *Schooley*, 2019 WL 2717888, at *75; *Est. of Johnson*, 2024 WL 3225954, at *14 (using this approach); *Thole*, 2024 WL 2208208, at *14 (same); *Gration*, 2023 WL 5221955, at *30 (same); *Ackley*, 2022 WL 3354720, at *51 (same); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL 619925, at *18 (same).  Richard Dobbins, who has not provided a VA disability rating will be awarded damages based on the descriptive and documentary evidence presented about his injuries.  *See Schooley*, 2019 WL 2717888, at *75 (adopting the same approach); *Akins*, 332 F. Supp. 3d at 40-41 (same).

Three servicemember plaintiffs—Brandan Johns, Benjamin Samples, and Maxaminneo King—can recover in the 70-100% disabled category.  *See supra* Part I.C (describing plaintiffs' disability ratings).  These three plaintiffs will therefore receive an award of $7,000,000 each.  *See also* Pls.' Mem. at 11-12, 14, 16 (requesting this amount).

One remaining plaintiff—Richard Dobbins—applied for a VA disability rating and had not received one at the time plaintiffs' motion was filed, but review of the affidavits and supporting evidence submitted by him demonstrate that he is entitled to the baseline award of $5,000,000, though he sought $7,000,000.  *Id.* at 17-18.  Dobbins attests that he suffered severe psychological effects from the attack—upon returning home, he has experienced PTSD, "nightmares," and "emotional problems."  Dobbins Decl. ¶ 12.  His "hypervigilance and an acute 'flight or fight'

response to ordinary everyday situations" including "[a]ny sort of shaking, such as a small earthquake [he] was in" and "any news story on the television about a violent attack or a bombing," "triggers intense fear." *Id.* ¶¶ 12, 16. These injuries make a baseline award of $5,000,000 appropriate. An upward deviation is not warranted, however, because his psychological injuries do not parallel someone "mistaken for dead," *Kaplan*, 213 F. Supp. 3d at 35 (internal quotation marks omitted), or completely disabled by their psychological wounds. The baseline will therefore be awarded.

### 3. Solatium

"Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *see also Fraenkel*, 892 F.3d at 357. Damages recoverable on the family members' claims of IIED thus will be discussed as one and the same as their claims for solatium.

The twenty-four remaining family member plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of servicemember victims. *See* Am. Compl. ¶¶ 61-64. "[S]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society." *Fraenkel*, 892 F.3d at 356 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)). The D.C. Circuit has explained that solatium "began as a remedy for the loss of a spouse or a parent. It has since expanded to include the loss of a child[,] . . . [a]nd in some circumstances, it can include the loss of a sibling." *K.E.F.V. by & through Vickers v. Islamic Republic of Iran*, 135 F.4th 988, 991-92 (D.C. Cir. 2025) (quoting *Fraenkel,* 892 F.3d at 356 (quoting *Flatow*, 999 F. Supp. at 29)). Two factors are considered in calculating solatium: "The first is the injury to the feelings of a family member caused by the circumstances of the decedent's death," and "[t]he

43

second is the loss of the decedent's comfort and society." *Id*. (internal quotations and citations omitted). "Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356-57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

The *Heiser I* framework for solatium damages has used as a guide in this Court, *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)), for purposes of consistency, though applying this framework is not mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted."). Indeed, "different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damages awards." *Id.* at 362 (quoting *Fraenkel v. Islamic Republic of Iran*, 258 F. Supp. 3d 77, 82 (D.D.C. 2017)). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011).

Blunt application of the *Heiser* framework can fail "to assess each plaintiff's injuries individually." *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065 (JDB), 2022 WL 2817730, at *43 (D.D.C. July 19, 2022). Ensuring that "individuals with similar injuries receive similar awards," *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) (quoting *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 48 (D.D.C. 2012)), requires adjustments so

44

that awards reflect differences in the degree of injury. For example, servicemembers directly injured in terrorist attacks should receive substantially more than their own spouses, who suffer none of the physical injuries and whose emotional injuries—while often undoubtedly severe—are generally less acute. *See Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014); *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 15-16 (D.D.C. 2012). Even outside of a single-family unit, family members of surviving servicemembers should generally not receive more than other servicemember victims injured in the same attack. To the extent deviations from the *Heiser* framework are needed to accomplish commonsense proportionality between awards, such deviations promote courts' "primary consideration" of overall consistency and common sense. *Moradi*, 77 F. Supp. 3d at 70.

The damages awards for plaintiff-spouses are addressed first, followed by parents, children, and siblings.

*a. Spouses*

Two of the family member plaintiffs—Sandra Conard and Stephanie Guzik—are the divorced former spouses of injured servicemembers. Both have described the toll that the impacts of the bombing have taken in the years since. *See* S. Conard Decl. ¶¶ 9-12; S. Guzik Decl. ¶¶ 10-14.

Although the *Heiser* framework recommends an award at a baseline of $4,000,000 to spouses, deviations are appropriate to make awards proportional to the injuries and associated awards to servicemembers and family members. As a baseline here, each divorced spouse will receive half the award that their associated servicemember spouse received, to ensure that people whose servicemember spouses returned grievously injured or entirely disabled receive a larger award than those whose spouses, while injured in the Khobar towers attack, continued to be able

to function afterward. *See Breezee*, 2025 WL 2719250, at *31. Though that baseline would be, for Sandra Conard, $3,500,000, and, for Stephanie Guzik, $2,500,000, further deviation is warranted here.

Both former spouses have, since the terrorist attack, divorced their injured servicemember spouses, in both instances in 2002. *See* S. Conard Decl. ¶ 12; Samples Decl. ¶ 13; S. Guzik Decl. ¶ 13; Dobbins Decl. ¶ 12. As plaintiffs acknowledge, Pls.' Mem. at 15, 19, downward deviations from the baseline may be appropriate when "attenuation in the relationship has occurred," and the family member no longer deals with the servicemember and his injuries on a day-to-day basis. *See, e.g.*, *Gration*, 2023 WL 5221955, at *34; *Aceto*, 2020 WL 619925, at *21 (similar). *But see, e.g.*, *Spencer*, 71 F. Supp. 3d at 28-29 (holding that despite divorce, "[t]he Court need not depart from its usual solatium damages framework as to spouses . . . because evidence . . . indicated that [the couple] were married at the time of the bombing and remained married" for two decades, the victim's wife "suffered compensable emotional trauma as a result of the attack, and at least one witness attributed the dissolution of their marriage to the after effects of the attack").

Plaintiffs request a downward departure to $2,000,000 for each of these former spouses, Pls.' Mem. at 15, 19, and that award is appropriate since both former spouses spent the first six years after the bombing with the injured servicemembers when the injuries were, perhaps, most acute and unremediated. *See, e.g.*, *St. John*, 2026 WL 1532818, at *48 (BAH) (adjusting one former spouse's award from $3,500,000 baseline to $2,500,000, when she and her servicemember spouse divorced in 2000); *Gration*, 2023 WL 5221955, at *34 (BAH) (declining to reduce former spouses' awards because their declarations described "emotional anguish" in the period after the attack and prior to divorce); *Aceto*, 2020 WL 619925, at *21 (BAH) (awarding $1,500,000 in solatium damages to plaintiff whose servicemember former spouse received $3,000,000, because

46

they divorced "a few years" after the attack).  Although Stephanie Guzik's former husband, Richard Dobbins, is receiving a lower award of $5,000,000, compared to Sandra Conard's former husband Benjamin Samples, who is receiving $7,000,000, Stephanie attests that "things got worse and worse [after the attack] and escalated to an incident of domestic violence" though Stephanie "tried very hard to make the marriage work."  S. Guzik Decl. ¶¶ 11-13.  Sandra, on the other hand, explains that "what Ben went through at the Khobar Towers in 1996" "certainly contributed to [their breakup]," but she "can't say" that it "was the sole cause."  S. Conard Decl. ¶ 12.  Given these relative experiences of hardship stemming from the Khobar Towers attack and their former spouses' relative damages awards, each former spouse is granted an identical award of $2,000,000.

b.  *Parents*

Five of the family member plaintiffs will receive awards as parents of servicemembers who were injured at the Khobar Towers attack: John Johns, Carol Samples, Gary Leinenbach, Sr., Sheryl Ziegler, and Carolyn Kuhn.  These parents have attested to their panic upon learning about the attack and in the days and years following as they struggled with increased anxiety over their children's safety and witnessing their children deal with the psychological after-effects of the attack.[14]  These harms are consistent with those suffered by many parents of victims of terrorism.  *See Valencia*, 774 F. Supp. 2d at 16.

The parents of the injured and surviving servicemembers are each entitled to a baseline award of $2,500,000.  *See Akins*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured servicemembers).  That baseline is appropriate here because each of the servicemember children of these parents received at least $5,000,000 in damages.  *See supra* Part III.D.2 (Brandan

---

[14]     *See* J. Johns First Decl. ¶¶ 6-7; C. Samples Decl. ¶¶ 7, 11; G. Leinenbach, Sr. Decl. ¶¶ 7, 10; S. Ziegler Decl. ¶¶ 6, 8, 11; C. Kuhn Decl. ¶¶ 5, 9-10.

Johns, child of John Johns, and Benjamin Samples, child of Carol Samples); *Akins*, 332 F. Supp. 3d at 41 (Greg Leinenbach, child of Gary Leinenbach Sr.; Eric Ziegler, child of Sheryl Ziegler; and Todd Akins, child of Carolyn Kuhn).

  *c. Children*

  Three of the family member plaintiffs are children of servicemembers injured in the Khobar Towers bombing: Cykia King, Alexandra Dobbins, and Sarah Nordin. These plaintiffs describe confusion or fear in the immediate aftermath of the bombing and difficulties in their relationships with their servicemember parents that they attribute at least in part to the impacts of the bombing.[15] Although Alexandra Dobbins had "hazy" recollection of the attack when she was four years old, and Sarah Nordin was too young at the time of the bombing to remember the events firsthand, *see* A. Dobbins Decl. ¶ 3; S. Nordin Decl. ¶ 3, this lack of awareness does not lessen the distress they experienced from growing up with a parent suffering from psychological symptoms from the attack, *see* A. Dobbins Decl. ¶¶ 5-9; S. Nordin Decl. ¶¶ 7, 11; *see also, e.g.*, *Schooley*, 2019 WL 2717888, at *78 (holding the same); *Aceto*, 2020 WL 619925, at *22 (same); *K.E.F.V.*, 135 F.4th at 992 (allowing child who "was not yet born when Iran helped the Taliban kill her father" to "recover solatium for the loss of her father's comfort and society").

  "Children of a surviving victim receive $1.5 million on average" under the *Heiser* framework, and that baseline amount is appropriate here, *Spencer*, 71 F. Supp. 3d at 28, since each servicemember parent was awarded at least $5,000,000, *see supra* Part III.D.2 (Maxaminneo King, parent of Cykia King, and Richard Dobbins, parent of Alexandra Dobbins); *Akins*, 332 F. Supp. 3d at 47 (Eric Ziegler, parent of Sarah Nordin), meaning that no downward departure for proportionality is required. Plaintiffs argue for an "upward departure" to $2,500,000 in damages

---

[15] *See* C. King Decl. ¶¶ 4-5, 7, 11-12; A. Dobbins Decl. ¶¶ 5-9; S. Nordin Decl. ¶¶ 7, 11, 13.

for each of the three children, Pls.' Mem. at 17, citing this Court's decision in *Estate of Johnson*, 2024 WL 3225954, in which a child plaintiff received $2,500,000, *id.* at *15.  In that case, however, the child plaintiff described that her servicemember mother "became manipulative," "would often threaten to commit suicide," and was unable to support the child plaintiff after she suffered sexual abuse, and that the child plaintiff "eventually had her mother involuntarily committed."  *Id.* Although the instant plaintiffs describe psychological injuries characteristic of children of injured servicemembers, they do not present any evidence of similarly pervasive or severe circumstances warranting an upward deviation.  Each child plaintiff will therefore receive the baseline award of $1,500,000.

### d.  Siblings

Finally, fourteen of the family member plaintiffs are siblings of servicemember plaintiffs: Mary Beth Husing, Meredith Kitchen, Gary Leinenbach, Jr., Shannon Leinenbach, Anthony Winter, Shannon Stiles, Andrew Ziegler, Rhonda Crabtree, Amy Ziegler, Allan Aceto, Summer Fleming, Norberto Manrique, Bruce Akins, and Karen Erdman.  Each has described distress upon learning about the bombing and has suffered from the ongoing effects of the attack on their respective siblings and families.[16]  These harms are consistent with those suffered by many siblings of victims of terrorism.  *See Akins*, 332 F. Supp. 3d at 45.  Within the *Heiser* framework, ten siblings—Mary Beth Husing, Meredith Kitchen, Gary Leinenbach, Jr., Shannon Leinenbach, Andrew Ziegler, Rhonda Crabtree, Amy Ziegler, Noberto Manrique, Bruce Akins, and Karen Erdman—are each entitled to an award of $1,250,000, since each of their servicemember siblings

---

[16]     *See* M. Husing Decl. ¶¶ 6-7; M. Kitchen Decl. ¶¶ 7-10; G. Leinenbach, Jr. Decl. ¶¶ 7, 9-10; S. Leinenbach Decl. ¶¶ 5-8; A. Winter Decl. ¶¶ 7, 9, 12; S. Stiles Decl. ¶¶ 5-8; An. Ziegler Decl. ¶¶ 9, 11; R. Crabtree Decl. ¶¶ 5, 7-8; Am. Ziegler Decl. ¶¶ 9-11; A. Aceto Decl. ¶¶ 6, 8; S. Fleming Decl. ¶¶ 6, 12, 14; N. Manrique Decl. ¶¶ 8, 11, 13; B. Akins Decl. ¶ 7, 9; K. Erdman Decl. ¶ 5, 7.

received at least $5,000,000 in damages for their injuries. *See id.* (awarding a baseline amount of $1,250,000 to siblings of injured service members); *see also Aceto*, 2020 WL 619925, at *23 (no downward departure for siblings of servicemembers who were awarded $5,000,000 or more).[17]

Four of the sibling plaintiffs' servicemember siblings received less than $5,000,000 in damages, in which situation a downward departure has been found to be appropriate to achieve proportionality between the damages of plaintiffs whose servicemember relatives are more or less severely injured, *Spencer*, 71 F.Supp.3d at 28, but in this case, these four sibling plaintiffs are nonetheless entitled to the baseline award. Tracy Matt Winter, the servicemember sibling of Anthony Winter and Shannon Stiles, received $2,500,000 in damages in *Akins*, 332 F. Supp. 3d at 27, 41, 47. He then twice unsuccessfully sought to have his damages award adjusted after judgment, first pursuant to Federal Rule of Civil Procedure 60(b), on the basis that his VA Disability Rating of 70% would have entitled him to $7,000,000 in damages under the *Schooley* rubric, which was developed after *Akins* was decided, *see* Mot. for Relief from Judgment, *Akins*, No. 17-cv-675 (BAH) (D.D.C. filed Jan. 8, 2021), ECF No. 42, and then again as a motion for supplemental damages based on a similar theory, *see* Mot. for Supplemental Compensatory Damages, *Akins*, No. 17-cv-675 (BAH) (D.D.C. filed Dec. 11, 2024), ECF No. 47. These motions were both denied because plaintiffs did not meet the requirements for relief from judgment under Rule 60(b) and because the finality of judgment precluded adding supplemental damages. *See Akins v. Islamic Republic of Iran*, 549 F. Supp. 3d 104 (D.D.C. 2021) (denying Rule 60(b) motion); *Akins v. Islamic Republic of Iran*, No. 17-cv-675 (BAH), 2025 WL 1342644 (D.D.C. May 8, 2025) (denying motion for supplemental damages).

---

[17]    *See supra* Part III.D.2 (Brandan Johns, sibling of Mary Beth Husing, and Benjamin Samples, sibling of Meredith Kitchen); *Akins*, 33 F. Supp. 3d at 47 (Greg Leinenbach, sibling of Gary Leinenbach, Jr., and Shannon Leinenbach; Todd Akins, sibling of Bruce Akins and Karen Erdman; and Eric Ziegler, sibling of Andrew Ziegler, Rhonda Crabtree, and Amy Ziegler); *Thole*, 2024 WL 2208208, at *18 (Juan Manrique, sibling of Norberto Manrique).

Similarly, in *Aceto*, Steven Aceto, the servicemember sibling of Allan Aceto, received $3,000,000, and Shelley Cohen, the servicemember sibling of Summer Fleming, received $3,000,000. *See Aceto*, 2020 WL 619925, at *19, 23. These awards were premised in part on the fact that Steven Aceto had, at the time, a 50% disability rating, but did not provide evidence explaining whether that rating was attributable to injuries from the Khobar Towers attack specifically, *id.* at *3, 19 n.14, and Shelley Cohen had, at the time, no disability rating, *id.* at *6, 19. Their injuries were therefore assessed based on descriptive evidence presented, and each was awarded $3,000,000. These plaintiffs later moved for supplemental damages, since Aceto had since been diagnosed with 100% disabling PTSD attributable to the Khobar Towers attack, *see* Pls.' Mot. for Suppl. Damages ("*Aceto* Suppl. Damages Mot.") at 8, *Aceto*, No. 19-cv-464 (BAH) (D.D.C. filed Dec. 20, 2024), ECF No. 41, and since Shelley Cohen had since been assigned a VA Disability Rating of 100%, 30% of which was attributable to PTSD, *see id.* at 7; *id.*, Ex. F, Shelley Cohen VA Disability Rating. That motion was denied for the same reasons as the supplemental damages motion in *Akins*—the finality of judgment prohibited reconsideration of the damages award, even with updated evidence. *See* Minute Order (May 8, 2025), *Aceto*, No. 19-cv-464.

The instant plaintiffs argue, however, that the same finality-of-judgment concerns are not in play here, where new plaintiffs, the siblings of these three injured servicemembers, seek damages. *See* Pls.' Mem. at 22-23, 26 n.8, 27 n.9. Therefore, plaintiffs argue, these four sibling plaintiffs should receive the full baseline sibling award of $1.25 million based on their servicemember siblings' present VA Disability Ratings, each of which would result in a damages award of $5,000,000 or more for the servicemember under the *Schooley* rubric. The Court agrees. The driving consideration behind damages awards in FSIA terrorism cases is ensuring that "individuals with similar injuries receive similar awards," *Moradi*, 77 F. Supp. 3d at 70 (internal

quotation marks omitted), and Anthony Winter, Shannon Stiles, Allan Aceto, and Summer Fleming are each injured by the Khobar Towers attack in the same way that any other sibling of a servicemember with a significant disability stemming from that attack would be. Awarding them damages based on the present disabilities of their siblings and the corresponding effects on them does not affect the finality of the judgments held by their siblings and is therefore appropriate. Anthony Winter, Shannon Stiles, Allan Aceto, and Summer Fleming are therefore each awarded $1,250,000.

### 4. Punitive Damages

In addition to compensatory damages, plaintiffs seek punitive damages under 28 U.S.C. § 1605A(c). *See* Am. Compl. ¶¶ 65-68 (Count V); Pls.' Mem. at 31. The Supreme Court has laid out three "guideposts" for "reviewing punitive damages" awards: "(1) the degree of reprehensibility of the defendants' misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Weighing this precedent, *Christie* awarded "[p]unitive damages equal to compensatory damages" in light of the "identified flaws in [other] methods" for determining punitive damages. 2020 WL 3606273, at *27. Specifically, *Christie* determined that this method avoided the pitfalls of "a singular focus on deterrence," "elevat[ing] superficial similarities over meaningful ones," and "skim[ming] over analysis of the plaintiffs' precise harms," and does not "yield an excessive award." *Id.* at *28. Awarding punitive damages equal to compensatory damages, *Christie* concluded, was most appropriate because "plaintiffs [were] already receiving substantial compensatory awards," *id.*, "'[t]he compensatory damages for

the injury suffered' . . . [were] 'based on a component which' would be 'duplicated in the punitive award,'" *id.* (quoting *State Farm*, 538 U.S. at 426), and "[a]dding hundreds of millions of dollars to [the] amount [of outstanding court judgments already owed by Iran] . . . [was] not likely to have a meaningful deterrent effect," *id.* at *29.

Given that *Christie* reached this conclusion based on the same event at issue in the present case, and that plaintiffs urge the Court to adopt this calculation, Pls.' Mem. at 31, the *Christie* punitive damages approach, which has likewise been applied in other cases in this Court, *see, e.g.*, *Blank*, 2021 WL 3021450, at *13; *Ackley*, 2022 WL 3354720, at *60; *Gration*, 2023 WL 5221955, at *36; *Thole*, 2024 WL 2208208, at *17; *Est. of Johnson*, 2024 WL 3225954, at *16, will also be applied here. Accordingly, a punitive damages award equal to the compensatory damages awarded in this case is most appropriate.

Plaintiffs are therefore entitled to a total punitive damages award of $64,500,000 to be apportioned among plaintiffs according to their compensatory damages.

### E. Post-Judgment Interest

Finally, post-judgment interest must be awarded against a foreign sovereign when the FSIA provides jurisdiction. *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005); *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013); *Schooley*, 2019 WL 2717888, at *79. Under federal law, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and "[s]uch interest shall be calculated from the date of the entry of judgment." 28 U.S.C. § 1961(a). Application of Section 1961(a) is mandatory, not discretionary. *See, e.g.*, *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs. LLC*, 962 F.

Supp. 2d at 165; *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 78 (D.D.C. 2021).[18] Plaintiffs will therefore be awarded post-judgment interest at the statutory rate set out in 28 U.S.C. § 1961.[19]

## IV.   CONCLUSION

Plaintiffs' motion for default judgment as to liability and damages, ECF No. 20, is denied, without prejudice, with respect to Ricardo Tejada, the foreign citizen father of injured servicemember Cielito Valencia, and the estate of Rosemary Johns, the deceased mother of injured servicemember Brandan Johns, and granted with respect to the remaining twenty-eight plaintiffs. Iran is liable for the pain and suffering inflicted on the four servicemember plaintiffs and for the emotional distress inflicted on twenty-four of the family member plaintiffs.

Monetary damages are awarded to plaintiffs in the following amounts, with post-judgment interest at the rate set out in 28 U.S.C. § 1961:

---

[18]   While plaintiffs do not expressly request post-judgment interest, *see generally* Am. Compl. at 21 (only seeking prejudgment interest); Pls.' Mem., they are nonetheless entitled to such interest under 26 U.S.C. § 1961(a). *See Prime Victor Int'l Ltd. v. Simulacra Corp.*, 682 F. Supp. 3d 428, 448 n.158 (D. Del. 2023) ("Although Prime Victor does not request post-judgment interest in its Complaint, post-judgment interest is mandatory by federal statute." (citing *Bleeker v. Zetian Sys., Inc.*, No. 12-cv-2151 (DLC), 2013 WL 5951162, at *9 (S.D.N.Y. Nov 1, 2013))). Indeed, even when a Court fails to order post-judgment interest, interest is automatically applied to federal judgments. *See, e.g.*, *Dunn v. HOVIC*, 13 F.3d 58, 62 (3d Cir. 1993) ("Post-judgment interest accrues from the date of a judgment whether or not the judgment expressly includes it, because such interest follows as a legal incident from the statute providing for it." (alterations accepted) (quoting *Tinsley v. Sea-Land Corp.*, 979 F.2d 1382, 1384 (9th Cir. 1992))); *United States v. Michael Schiavone & Sons, Inc.*, 450 F.2d 875, 876-77 (1st Cir. 1971) (explaining that, regardless of whether the judgment itself contains a specific award of interest, the prevailing party becomes a judgment creditor upon entry of final judgment in a federal civil suit and is entitled to post-judgment interest under the mandatory terms of 28 U.S.C. § 1961).

[19]   Plaintiffs request prejudgment interest in their complaint, *see* Am. Compl. at 21, but not in their motion for default judgment. *See generally* Pls.' Mot.; Pls.' Mem. To the extent they seek such interest, that request is denied. Whether to award prejudgment interest "is a question that rests within this Court's discretion, subject to equitable considerations." *Oveissi*, 879 F. Supp. 2d at 58*; see also, e.g.*, *Oldham v. Korean Air Lines Co., Ltd.*, 127 F.3d 43, 54 (D.C. Cir. 1997); *Akins*, 332 F. Supp. 3d at 45-46; *Thole*, 2024 WL 2208208, at *17. In FSIA cases, most Judges on this Court who have considered this issue have concluded—as this Court did in *Akins*—that "pain and suffering and solatium damages are both designed to be fully compensatory" and prejudgment interest is therefore unwarranted as to those categories of damages. *Barry*, 437 F. Supp. 3d at 60 (Contreras, J.) (quoting *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012) (Lamberth, J.)); *see also Akins*, 332 F. Supp. 3d at 46 (same).

- Servicemember plaintiffs Brandan Johns, Benjamin Samples, and Maxaminneo King are each awarded $7,000,000 in pain and suffering damages and $7,000,000 in punitive damages, totaling $14,000,000 each;

- Servicemember plaintiff Richard Dobbins is awarded $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages, totaling $10,000,000;

- Plaintiff-spouses Sandra Conard and Stephanie Guzik are each awarded $2,000,000 in solatium damages and $2,000,000 in punitive damages, totaling $4,000,000 each;

- Plaintiff-parents John Johns, Carol Samples, Gary Leinenbach, Sr., Sheryl Ziegler, and Carolyn Kuhn are each awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages, totaling $5,000,000 each;

- Plaintiff-children Cykia King, Alexandra Dobbins, and Sarah Nordin are each awarded $1,500,000 in solatium damages and $1,500,000 in punitive damages, totaling $3,000,000 each;

- Plaintiff-siblings Mary Beth Husing, Meredith Kitchen, Gary Leinenbach, Jr., Shannon Leinenbach, Anthony Winter, Shannon Stiles, Andrew Ziegler, Rhonda Crabtree, Amy Ziegler, Allan Aceto, Summer Fleming, Norberto Manrique, Bruce Akins, and Karen Erdman are each awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages, totaling $2,500,000 each.

Thus, the total compensatory damages award is $64,500,000 and the total punitive damages award is $64,500,000 for a total damages award against Iran of $129,000,000, each with post-judgment interest accruing at the rate specified in 28 U.S.C. § 1961(a).

Plaintiffs' request for prejudgment interest is **DENIED**.

Plaintiffs' Motion to Expedite Consideration, ECF No. 23, is **DENIED** as moot.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: July 6, 2026

_____
**BERYL A. HOWELL**
United States District Judge